UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| RODNEY D. JONES, | ) |
|---|---|
| Plaintiff, | ) |
| vs. | ) Cause No. 1:13-cv-764-WTL-DML |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Rodney D. Jones requests judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Social Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). The Court rules as follows.

### I. APPLICABLE STANDARD

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity he is

not disabled, despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while "[s]he is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## II. **BACKGROUND**

After his application for SSI was denied the first time due to insufficient evidence, Mr. Jones filed a second SSI request on April 17, 2012, alleging he became disabled on January 1, 1995. In his application for benefits, Mr. Jones alleged that he was disabled because of bipolar disorder, diabetes, and hypertension. Mr. Jones' application was denied initially on June 4, 2012, and again upon reconsideration on August 21, 2012. Following the denial upon reconsideration, Mr. Jones requested and received a hearing before an Administrative Law Judge ("ALJ"). A hearing, during which Mr. Jones was represented by counsel, was held in front of ALJ Monica LaPolt on February 4, 2013. The ALJ issued her decision denying Mr. Jones' claim on February 21, 2013. The Appeals Council upheld the ALJ's decision and denied Mr. Jones' request for review on March 26, 2013. This action for judicial review ensued, thereby rendering the ALJ's decision the final decision of the Commissioner and subject to judicial review.

*Medical Evidence*

On January 2, 2008, Mr. Jones attended group therapy at the Wabash Valley Correctional Facility where he was an inmate. Mark Popovich, a licensed mental health counselor, noted that Mr. Jones suffered from diabetes and benign hypertensive heart disease. Popovich opined that Mr. Jones did not express suicidal or homicidal ideation. Mr. Jones' Global Assessment Functioning ("GAF") score was noted as 60. R. at 244-45.

On January 15, 2008, Popovich noted Mr. Jones' GAF score as 62. He also noted that Mr. Jones had "explosive aggressive outbursts disproportionate to precipitating event." *Id*. at 252-53. On February 12, 2008, Popovich noted Mr. Jones' GAF score as 65 and also noted that Mr. Jones had impulse control problems. *Id*. at 275-76. Popovich continued to see Mr. Jones throughout the spring of 2008, and he noted that Mr. Jones' GAF scores ranged from 60 to 75.

On March 11, 2008, Debra Hric, RN, saw Mr. Jones. She noted that he had no disability and was capable of performing activities of daily living. She also noted that he was free of illness or injury and free of physical, mental, or emotional impairment. *Id*. at 289-91. On February 3, 2009, Lesa Wolfe, LPN, saw Mr. Jones. She noted that he had no disability and was capable of performing activities of daily living. She also noted that he demonstrated an appropriate degree of knowledge and motivation and was able to perform self-care. *Id*. at 392-94. On February 9, 2010, Ms. Wolfe saw Mr. Jones again and noted that he had no disability and was capable of performing activities of daily living. *Id*. at 442.

In April 2010, Mr. Jones was released on parole from prison. On June 16, 2010, he was seen at the Midtown Community Mental Health Center Crisis Intervention Unit ("CIU") as a walk-in patient because he did not "want to be around people." He reported that he was experiencing a lot of changes, could not sleep, felt like he was back in prison, and had been easily irritated since his release. *Id*. at 484-85.

On June 9, 2010, Mr. Jones saw Dr. Sue Ellen Gaebler. Dr. Gaebler noted that Mr. Jones had diabetes and high blood pressure. She conducted a foot exam and recommended a podiatry consultation. *Id*. at 493. On July 7, 2010, Mr. Jones returned to Dr. Gaebler. He reported feeling stressed because he was looking for a job and attempting to adjust to life outside of prison. *Id*. at 492. On August 4, 2010, Mr. Jones returned to Dr. Gaebler. He reported feeling better but noted that he had a lot on his mind. *Id.*

On June 30, 2010, Mr. Jones was seen at Midtown Community Mental Health Center ("Midtown") for an intake. He reported that he had always experienced a depressed mood, mood swings, sleep disturbance, substance abuse, and irritability. It was noted that he had been diagnosed with Adjustment Disorder with mixed anxiety, depression, and alcohol abuse. *Id*. at

467. On July 8, 2010, Mr. Jones saw Dr. Kathryn Eschmann. She noted that his mood was depressed and he was irritable. She further noted that his symptoms were consistent with bipolar disorder. She prescribed Seroquel and Celexa. *Id*. at 565.

Mr. Jones was reincarcerated from September 2010 through December 2011. In January 2012, following his release from prison, Mr. Jones resumed his visits to Midtown. On January 12, 2012, Mr. Jones saw Dr. Eschmann. She noted that he heard voices, was paranoid, and felt like people were plotting against him. She prescribed him Seroquel and Celexa. *Id*. at 544. On February 15, 2012, Dr. Eschmann noted that Mr. Jones continued to feel depressed. *Id*. at 553.

On March 17, 2012, Mr. Jones went to the CIU walk-in clinic because he had a current suicide plan. He reported that he tried to cut his wrist with a razor in a suicide gesture, but his cousin stopped him. Mr. Jones also reported that he had hallucinations telling him to kill himself. He reported that his depression worsened and he wanted to isolate himself from others. His family reported that he had become withdrawn, quiet, and depressed, and that he had had an increase in anger, frustration, and pressure in his voice. *Id*. at 518. As a result, he was hospitalized at Wishard Hospital from March 17, 2012, to March 29, 2012.

Mr. Jones returned to prison again from April 2012 through October 2012. On May 23, 2012, Mr. Jones saw Ceola Berry, PhD, for a mental status examination. She noted that he had problems with concentration, short-term memory, and judgment. She noted that his ability to work would be primarily affected by his mood states and legal history. *Id*. at 678-80.

On May 30, 2012, Dr. Kari Kennedy, PsyD, a State Agency doctor, completed a psychiatric review. She noted that Mr. Jones had affective and personality disorders, but his impairments were not severe. *Id*. at 681-93. Mr. Jones did not undergo a physical examination due to his incarceration.

5

*Hearing Testimony*

At the hearing, Mr. Jones testified that he was homeless and lived in a mission. During the day he would go to the library; he was trying to get his GED. He forgot to take his medications about one or two days a week. He testified that he sometimes heard and saw things that were not really there, and he noted that he heard voices that told him to kill himself and he tried to do so, but his cousin stopped him. He testified that he had trouble concentrating and getting along with his family and the guards when he was in jail. He testified that he was paranoid and thought that people were going to hurt him.

Michael Blankenship, a vocational expert ("VE") also testified. The ALJ asked the VE to consider the Residual Functional Capacity ("RFC") for a hypothetical individual capable of the full range of light or medium work, where the individual has a mental capacity to understand, remember, and follow simple instructions within those parameters, and in the context of performing simple, routine, repetitive, concrete, and tangible tasks; who can sustain attention and the concentration skills sufficient to carry out work-like tasks with reasonable pace and persistence; and who must have work involving only brief, superficial interaction with co-workers, supervisors, and the general public. The VE testified that such an individual could perform work as a warehouse worker, hand packager, housekeeper, and a production assembler. The VE testified that such an individual could not sustain employment if he needed to take breaks of five to ten minutes every hour or if he needed to miss more than one day of work each month on an ongoing basis. He also testified that an individual could sustain employment if he was only off-task ten percent of the workday. He testified that an individual who engaged in physical altercations with co-workers or public supervisors would likely be fired.

## III. THE ALJ'S DECISION

The ALJ determined at step one that Mr. Jones had not engaged in substantial gainful activity since April 2, 2012, the alleged onset date. At steps two and three, the ALJ concluded that Mr. Jones had the severe impairments of dysthymic disorder and adjustment disorder, but that his impairments, singly or in combination, did not meet or medically equally a listed impairment. At step four, the ALJ determined that Mr. Jones had the RFC to perform a full range of work at all exertional levels with the following nonexertional restrictions:

> [T]he claimant has the mental capacity to understand, remember, and follow simple instructions. Within these parameters and in the context of performing simple, routine, repetitive, concrete, tangible tasks, the claimant is able to sustain attention and concentration skills to carry out work-like tasks with reasonable pace and persistence. Finally, the claimant is limited to only superficial, incidental interaction with co-workers, supervisors, and the public.

*Id*. at 15. Given that RFC, the ALJ determined that Mr. Jones could perform a range of work that exists in the national economy, including a store laborer, hand packager, housekeeper, and production assembler. Accordingly, the ALJ concluded that Mr. Jones was not disabled as defined by the Act.

## IV. DISCUSSION

In his brief in support of his request for judicial review, Mr. Jones presents four issues for the Court's review. First, he argues that substantial evidence fails to support the ALJ's determination that he was not disabled because he did not meet or medically equal Listing 12.04. Second, he argues that the ALJ's failure to summon a psychologist to testify about his psychiatric impairments requires reversal of the decision. Third, he argues that the ALJ's credibility determination is erroneous. And finally, he argues that substantial evidence fails to support the ALJ's Step Five determination that he was not disabled. The Court will address each argument, in turn, below.

7

### A. Lack of Substantial Evidence to Support the ALJ's Decision

Mr. Jones argues that substantial evidence fails to support the ALJ's determination that his combined impairments of major depressive disorder, psychotic features of hallucinations and paranoia, and GAF scores of 30 and below did not meet or equal Listing 12.04. Listing 12.04 requires the satisfaction of both paragraphs A and B or, in the alternative, that the requirements in paragraph C are met. The ALJ found that Mr. Jones did not meet or equal the requirements in paragraph B which require at least two of the following: 1) marked restriction of activities of daily living; 2) marked difficulties in maintaining social functioning; 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, app. 1. A marked restriction means "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

In her decision, the ALJ found that Mr. Jones had mild restrictions in activities of daily living, noting that he performed simple volunteer work at the mission, went to the library to read, was looking for work, was taking GED classes, and remembered to take his medications on most days. R. at 14. The ALJ found that Mr. Jones had moderate difficulties in maintaining social functioning, noting that Tanya Plummer, Mr. Jones' sister, indicated that he does not go anywhere on a regular basis and needs reminders for his doctor appointments. *Id.* The ALJ found that Mr. Jones also had moderate difficulties with concentration, persistence, or pace, noting that Ms. Plummer indicated that Mr. Jones has difficulty following written and spoken instructions. *Id.* Finally, the ALJ noted that Mr. Jones had experienced no episodes of

decomposition of extended duration. *Id.* Accordingly, the ALJ found that Mr. Jones did not meet or equal the requirements of paragraph B.

In arguing that the ALJ erred in concluding that he did not meet or medically equal Listing 12.04, Mr. Jones argues that she ignored or selectively considered a June 16, 2010,[1] assessment and a July 8, 2010, evaluation. The Court disagrees. On June 16, 2010, Mr. Jones was a walk-in patient at the CIU. During this visit, he reported that he was experiencing a lot of changes, could not sleep, and felt like he was back in prison. *Id*. at 484. At the July 8, 2010, evaluation, Dr. Eschmann noted that Mr. Jones was finding it hard to assimilate to society following his release from prison. She noted that he reported that he had mood swings and felt isolated, paranoid, and depressed. R. at 468.

It is well-established that an ALJ "is not required to address every piece of evidence or testimony[.]" *Dixon*, 270 F.3d at 1176. However, in Mr. Jones' case, the ALJ did not ignore these visits—she implicitly considered them when she referenced other visits during this time period and said that "the medical evidence does not indicate any psychological or psychiatric treatment." R. at 17. She further noted that during this time period, Mr. Jones' treatment at Midtown consisted of a care coordinator who was helping him apply for housing, entitlements, and disability, and find appropriate community resources.

Mr. Jones also argues that the ALJ ignored or selectively considered evaluations from January 11, 2012, January 12, 2012, and February 15, 2012, and his hospitalization in March 2012. The Court disagrees. The ALJ specifically mentioned the January 12, 2012, evaluation and noted that Mr. Jones was having mood and sleep problems and trouble adjusting to society after incarceration. *Id.* She also noted that during this time period, "the medical evidence

---

[1] Plaintiff's Brief mistakenly identifies the date of this visit as May 16, 2010. *See* Pl.'s Br. at 15.

indicates that the claimant experienced some symptoms of mood disorder after he was released from prison; however, he attributed his symptoms to life stressors and difficulty assimilating to society." *Id.* As for Mr. Jones' hospitalization, Mr. Jones points out that the ALJ did not specifically mention the records from March 17, 18, 19, or 29, 2012. However, the ALJ did discuss the hospitalization as a whole, noting that Mr. Jones had suicidal ideation and reported feeling "overwhelmed with the stress and pressure of imprisonment and his legal compliance as a violent offender." *Id.* She also noted that he was treated with his standard prescription medications and was discharged in a stable condition. Further, Mr. Jones has not identified what specific evidence from these visits illustrates that he meets the requirements of paragraph B. Instead, he merely lists the problems he reported during the evaluations. This is insufficient. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("Ribaudo [the claimant] has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing.").

Finally, Mr. Jones argues that the ALJ cited his GAF assessments above 50 but not those below 50. As the Commissioner points out, Mr. Jones did not present evidence of consistent GAF scores under 50, but instead identified a period of twelve days during which he was hospitalized when his GAF scores ranged from 29 to 40. The ALJ did not discuss his GAF scores from this time period, but she noted that the records from 2008 to 2010 indicated that Mr. Jones' GAF scores ranged from 60 to 75, R. at 16, and that following his hospitalization, Mr. Jones' GAF scores ranged from 75 to 80. *Id*. at 18. The Court does not believe that the ALJ's omission of the GAF scores from Mr. Jones' twelve-day hospitalization warrants remand. GAF scores, standing alone, do not automatically warrant a finding of disability or that a claimant equals a Listing. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("[N]owhere do the

Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score.") (quoting Wilkins v. Barnhart, 69 Fed. Appx. 775, 780 (7th Cir. 2003)).

Substantial evidence supports the ALJ's conclusion that while Mr. Jones does experience some limitations due to his mental impairments, those limitations are, at most, moderate. Accordingly, the Court sees no error with the ALJ's Step Three determination.

### B. Failure to Call a Medical Expert

According to Mr. Jones, "[t]he ALJ's failure to summon a medical advisor (psychologist) to testify whether the claimant's combined psychiatric impairments medically equaled any Listed impairment such as 12.04 requires reversal of the denial decision." Pl.'s Br. at 25. The Court disagrees.

Whether a claimant's condition meets or medically equals a listed impairment is "strictly a medical determination," and "the focus must be on medical evidence." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). However, the Court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record and what measures are needed to accomplish that goal. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2007); *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993). Thus, an ALJ's decision to call a medical expert is discretionary, 20 C.F.R. § 416.927(f)(2)(iii), and an ALJ is not required to consult a medical expert if the medical evidence in the record is adequate to render a decision on the claimant's disability. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Mr. Jones argues that the ALJ could not reasonably rely on the agency's physicians' reviews from October 21, 2010, June 4, 2012, and August 20, 2012,[2] because they did not consider all of the evidence. He specifically points to a January 9, 2013,[3] letter from the Indianapolis Public Schools' Special Education Department and a middle school transcript to indicate that he had been in special education. He argues, "[p]resumably if they had reviewed all of the evidence they would have reasonably determined he was totally disabled." Pl.'s Br. at 25. The Court does not agree.

Further, the October 21, 2010, and June 4, 2012, reviews that Mr. Jones takes issue with were not completed because there was insufficient evidence in the record. Similarly, the August 20, 2012, review was not completed because of Mr. Jones' incarceration. And, despite Mr. Jones' arguments, the ALJ said she accorded little weight to the State Agency doctors' assessments because "additional evidence admitted into the record indicates that the claimant was more limited than originally thought." R. at 20. Based on the foregoing, the ALJ did not err in failing to call a medical expert to testify at the hearing.

### C. The ALJ's Credibility Determination

Mr. Jones next argues that the ALJ's credibility determination is patently erroneous because it is contrary to Social Security Ruling ("SSR") 96-7p and is intentionally vague. The Court does not agree.

In determining credibility, an ALJ must consider several factors, including the claimant's daily activities, level of pain or symptoms, aggravating factors, medication, treatment, and limitations, *see* 20 C.F.R. § 404.1529(c); SSR 96–7p, and justify his finding with specific

---

[2] Plaintiff's Brief mistakenly identifies the date of this evaluation as August 21, 2012. *See* Pl.'s Br. at 25.

[3] Plaintiff's Brief mistakenly identifies the date of this letter as January 29, 2013. *See* Pl.'s Br. at 25.

reasons. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). "Furthermore, the ALJ may not discredit a claimant's testimony about [his] pain and limitations solely because there is no objective medical evidence supporting it." *Id.* (citations omitted). District courts "afford a credibility finding 'considerable deference,' and overturn [a finding] only if 'patently wrong.'" *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Carradine v. Barnhart*, 36 F.3d 751, 758 (7th Cir. 2004)).

Mr. Jones seems to fault the ALJ for using boilerplate language to explain her credibility finding. Although the Court shares in the sentiments expressed by the Seventh Circuit regarding the meaninglessness of Social Security "templates," such as the one used here, *see, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir. 2012), the ALJ in this case conducted a thorough credibility determination and identified several specific reasons for her finding.

Specifically, the ALJ noted that "[t]he medical evidence indicates that the claimant experienced some symptoms of mood disorder after he was released from prison; however, he attributed his symptoms to life stressors and difficulty assimilating to society." R. at 17. Further, the records showed that during his incarceration Mr. Jones did not receive ongoing psychiatric treatment, and his mental status examinations were within normal limits. On March 11, 2008, Ms. Hric, RN, noted that Mr. Jones was free of any physical, mental, or emotional impairment, and on February 3, 2009, and February 9, 2010, Ms. Wolfe, RN, noted that he had no disability. The ALJ noted that following his first release from prison, he began to visit Midtown for "assistance with reintegrating back into the community" and the treatment he received there consisted mostly of helping him apply for housing, entitlements, and disability. *Id.* She also noted that there was no record of psychological or psychiatric treatment. Further, the ALJ noted that following his next release from prison, treatment records indicate that he "experienced mood

13

swings due to life stressors such as legal compliance, employment search, homelessness, lack of income, [and] need for entitlements[.]" *Id.* While Mr. Jones was hospitalized in March 2012, due to suicidal ideation, the ALJ noted that he was discharged in a stable condition. In all, the ALJ noted that the records showed that Mr. Jones' treatment had been generally successful. *Id* at 19.

The ALJ thoroughly discussed the record evidence despite her use of the boilerplate language. The ALJ's credibility finding was based on substantial evidence, and thus, the Court does not find it to be patently wrong.

**D. Step Five Determination**

Finally, Mr. Jones argues that the ALJ erred when she determined that he was not disabled because he could perform some jobs. The source of this error, Jones argues, is the ALJ's hypothetical question to the VE that impermissibly failed to account for his moderate difficulties in social functioning and in concentration, persistence or pace. In support of his argument, Jones analogizes this case to *Yost v. Astrue*, in which the decision of the Commissioner was reversed because the Court "simply [could] not know whether the ALJ sufficiently addressed the limitations of concentration, persistence and pace by instructing the VE to consider only simple, unskilled jobs." 2012 WL 2814373 at *20 (N.D. Ill. 2012). The Court in *Yost* expressed concern that focusing on the skill level of the work did not fully address the impact of mental limitations. *Id.*

Here, however, to the extent that the ALJ found Mr. Jones to have moderate restrictions in social functioning and in maintaining concentration, persistence or pace, his RFC adequately reflects those limitations in a way that distinguishes this case from *Yost*. Specifically, the ALJ did not simply limit Mr. Jones to "unskilled work"; rather, she limited Mr. Jones to "simple,

14

routine, repetitive, concrete, tangible tasks" and to "superficial, incidental interaction with co-workers, supervisors, and the general public." R. at 15. The ALJ's hypothetical was entirely consistent with her RFC finding, and accordingly, the Court finds no reversible error.

## V. CONCLUSION

The ALJ in this case satisfied her obligation to articulate the reasons for her decision, and that decision is supported by substantial evidence in the record. Accordingly, the decision of the Commissioner is **AFFIRMED**.

SO ORDERED: 07/01/2014

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication